1  BRANDON D. WRIGHT, ESQ.
   Nevada Bar No. 13286
2  Brandon.Wright@lewisbrisbois.com
   LEWIS BRISBOIS BISGAARD & SMITH LLP
3  5555 Kietzke Lane, Suite 200
   Reno, Nevada 89511
4  Telephone: 775.399.6383

5  GREGG E. CLIFTON, ESQ. (PRO HAC VICE PENDING)
   Gregg.clifton@lewisbrisbosi.com
6  LEWIS BRISBOIS BISGAARD & SMITH, LLP
   2929 North Central Avenue, Ste. 1700
7  Phoenix, AZ 85012
   Telephone: 857.313.3950
8
   Attorneys for Plaintiff
9  CORTEZ BRAHAM, JR.,

10                      UNITED STATES DISTRICT COURT

11                          DISTRICT OF NEVADA

12  CORTEZ BRAHAM, JR.,                    Case No.

13            Plaintiff,                   **COMPLAINT FOR INJUNCTIVE
                                           RELIEF**
14       vs.

15  NATIONAL COLLEGIATE ATHLETIC
16  ASSOCIATION,

17            Defendant.

18

19       COMES NOW Plaintiff CORTEZ BRAHAM, JR., ("Plaintiff") and brings this action

20  against Defendant NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, ("Defendant") by

21  and through his counsel of record, BRANDON D. WRIGHT, ESQ.,  and GREGG E. CLIFTON,

22  ESQ.,(*Pro Hac Vice Pending*), of and for the law firm of LEWIS BRISBOIS BISGAARD AND

23  SMITH.

24       1.       Plaintiff CORTEZ BRAHAM JR., ("Plaintiff' or "Braham") brings this action for

25  immediate and permanent injunctive relief, compensatory and punitive damages, and attorneys' fees

26  and costs to enjoin and redress the National Collegiate Athletic Association's ("NCAA" or

27  "Defendant") use against Braham, a student athlete, of unlawful eligibility rules that are currently

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1    preventing him from competing for a Division I institution for the 2025-26 season in violation of

2    federal antitrust laws.

3        2.    More specifically, this Action seeks to challenge the NCAA 2-4 Transfer Rule and

4    NCAA Bylaw 12.8 (collectively, referred to as the "JUCO Eligibility Limitation Bylaws"), which

5    arbitrarily restrict the ability of former junior college ("JUCO") players to compete in NCAA

6    Division I sports after transferring and limit the amount of time JUCO players can compete in the

7    NCAA. These JUCO Eligibility Limitation Bylaws are unlawful and have a substantial anti-

8    competitive impact, which drastically affects junior colleges and their student-athletes who are not

9    eligible for NCAA membership.

10        3.    The current NCAA rules discourage student-athletes from attending JUCOs. While

11    some student athletes need or desire additional time to academically prepare for four-year colleges,

12    the NCAA rules punish those who do seek this interim educational adjustment period. These anti-

13    competitive rules are evident and causing a traumatic impact on Braham, who attended junior

14    college to help improve his academic standing and physical maturity to play Division I football, but

15    these current NCAA rules are preventing him from being able to transfer to another school to

16    complete his fourth year of athletic eligibility.

17        4.    In addition, the JUCO Eligibility Limitation Bylaws unlawfully hinder student-

18    athletes from earning compensation through the use of their Name, Image, and Likeness

19    opportunities directly tied to their participation as NCAA Division I football players.  This Action

20    seeks declaratory and injunctive relief against the NCAA for a violation of Section 1 of the Sherman

21    Act, 15 U.S.C. § 1, for its continued discrimination against JUCO athletes.

**INTRODUCTION**

23        5.    In *NCAA v. Alston*, a landmark 2021 decision, a unanimous U.S. Supreme Court

24    paved the way for the NCAA to allow college athletes to receive compensation for the use of their

25    Name, Image, and Likeness ("NIL Compensation") due to the NCAA's violation of antitrust laws.

26    *National Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69 (2021) ("*Alston*").

27        6.    The market realities of college sports have changed tremendously over the last forty

28    (40) years. For instance, from 1982 to 1984, CBS Broadcasting Inc. paid $16 million per year to

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

televise the March Madness Division I men's basketball tournament. *Alston*, 594 U.S. at 93.  In 2016, those annual television rights increased to $1.1 billion. *Id*.  As a result, the NCAA is no longer even arguably entitled to any "sort of judicially ordained immunity from the terms of the Sherman Act for its restraints of trade." *Id.* at 94. Experts have stated that the NCAA exercises "monopsony power in this market." *Elad v. National Collegiate Athletic Ass'n*, 3:25-cv-01981-ZNQ-JTQ,  U.S. Dist. Ct. of N.J, Opinion, (April 25, 2024) (referred to as "*Elad*") (citing *Alston*). A copy of the New Jersey Federal District Court's *Elad* opinion is annexed as **Exhibit A,** pg.4.

7.     In response to the Supreme Court's lecture that the NCAA received in *Alston* and the scathing criticisms it received in Judge Kavanaugh's concurring opinion, the NCAA lifted its prohibition on NCAA athletes receiving NIL Compensation on July 1, 2021. *Alston.*  In the nearly 4 years since, the market for NIL Compensation opportunities available to NCAA Division I athletes has exploded, with the 2024 college football NIL market estimated at $1.1 billion. *See* NIL-AT-3- The Annual Opendorse Report, annexed as **Exhibit B,** pg. 4. Significantly, those NIL Compensation opportunities are virtually only available to NCAA Division 1 athletes. Only $6.5 million – less than six tenths of one percent (0.6%) of the $1.1 billion in football NIL Compensation this year projects to go to non-NCAA Division 1 football players. *Id*.

8.     The Supreme Court has characterized the NCAA as a "sprawling enterprise" that generates billions of dollars in revenue each year.  *Alston*, 594 U.S. at 79, 93.

9.     In other words, athletes playing football outside of the NCAA monopoly have no meaningful opportunity to profit from their NIL. Athletes who begin their football careers outside the NCAA, particularly at JUCOs, are effectively denied meaningful opportunities to profit from their NIL as a result of this non-NCAA athletic participation.

10.     The NCAA's eligibility rules at issue here, the JUCO Eligibility Limitation Bylaws, impose unlawful restrictions with substantial anti-competitive effects, particularly on two-year junior colleges that fall outside NCAA membership opportunities. Under current NCAA Division I rules, the NCAA mandates that JUCO student-athletes transferring to a Division I institution must have a minimum GPA of 2.5 in transferable credit hours. See NCAA Guide for Two-Year Transfers 2024-2025 annexed as **Exhibit C,** pg.11. However, this GPA requirement is notably higher than the

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1  minimum GPA required for student-athletes transferring between four-year institutions, which can
2  be as low as 2.0. *Id.*

3       11.    As further evidence of unlawful restrictions with substantial anti-competitive effects,
4  student-athletes are permitted only four (4) seasons of competition within a five (5) year window,
5  regardless of whether some or all of that time is spent at a JUCO. *Id.* at 21. This so-called "Five-
6  Year Rule" discourages athletes from using JUCOs as a proper steppingstone to four-year
7  institutions, penalizing those who do so despite the critical academic and developmental support
8  those institutions provide. *Id.*

9       12.    In turn, the impact of this rule has deprived JUCOs of access to elite athletic talent,
10  limiting their competitiveness and stifling broader market participation. These harms are
11  compounded by the JUCO Eligibility Limitation Bylaws, which uniquely disadvantage athletes who
12  begin their collegiate careers at two-year colleges. Unlike other football players who enroll directly
13  at NCAA institutions and receive four seasons of eligibility and corresponding NIL earning
14  potential, JUCO athletes are arbitrarily limited to only two or three seasons of NCAA Division I
15  competition.

16       13.    The NCAA has historically disadvantaged JUCO athletes by limiting their
17  opportunities and imposing additional academic hurdles on those seeking to transfer to an NCAA
18  institution.

19       14.    Braham has more than a reasonable probability of success on the merits of his factual
20  allegations underlying this matter that are contained in this Complaint, which was certainly unlawful
21  as the Supreme Court's decision in *Alston* in 2021 opened the door for students to benefit from NIL
22  deals. This has "drastically changed the landscape of collegiate athletics by allowing student-athletes
23  to earn compensation for their name, image, and likeness ('NIL')." *Pavia v. National Collegiate
24  Athletic Ass'n*, Civ. No. 24-01336, 2024 WL 5159888 *1 (M.D. Tenn. Dec. 18, 2024) ("*Pavia*"). As
25  such, courts throughout the nation have been trending towards granting preliminary injunctions and
26  finding the JUCO Eligibility Limitation Bylaws commercial in nature because an NIL agreement is
27  a commercial transaction, and the JUCO Eligibility Limitation Bylaws limit who is eligible to play
28  and, therefore, to negotiate a NIL agreement. *Id.* at *6; *see also Elad*, **Exhibit A,** pg. 13.

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

15.    Far from promoting competition or benefiting student-athletes, these JUCO Eligibility Limitation Bylaws actively suppress it, distorting the labor market for college football players, diminishing athlete welfare, and weakening the quality of play available to the public. The rules directly conflict with the NCAA's stated mission of supporting athlete well-being and constitute precisely the kind of anti-competitive restraint the antitrust laws are designed to prohibit. For Braham and similarly situated former JUCO athletes, like *Elad* and *Pavia*, the window to compete at the NCAA Division I level is rapidly closing, and absent judicial intervention, these NCAA mandated limitations will cause irreparable harm to their athletic careers.

16.    Unless enjoined, the effect of the NCAA's anti-competitive conduct will result in Braham being punished and penalized for having attended a JUCO. It will also permanently deprive him of a once-in-a-lifetime NIL contract opportunity worth nearly $500,000 and the opportunity to enhance his career and reputation by playing another year of Division I football. Additionally, this will harm Braham's lifetime of hard work in the classroom and on the football field that he has pursued to even be considered for these opportunities. The NCAA's anti-competitive conduct, coupled with his former university affiliation's unreasonable denial of Braham's ability to request a specific NCAA waiver, is resulting in irreversible damage. A copy of the affidavit is annexed as **Exhibit D**. This conduct threatens him with immediate irreparable harm, with no solution. It is clear that absent the issuing of a TRO and/or preliminary injunction in this matter Plaintiff will experience irreparable harm.

17.    These JUCO Eligibility Limitation Bylaws stifle the competition in the labor market for NCAA Division I football players, harming college athletes and degrading the quality of Division I football consumed by the public. These limitations are contrary to the NCAA's stated mission of promoting the well-being of college athletes and are the very ills federal antitrust law seeks to remedy. Braham and other former JUCO football players who are harmed by this illegal restraint have a small window of time to compete in Division I football. Unfortunately, Braham cannot relive his shortened college career. The harm inflicted by the JUCO Eligibility Limitation Bylaws is irreparable and ongoing, and temporary and preliminary injunctive relief is necessary and adequate. *Czipott v. Fleigh*, 87 Nev. 496, 498-99, 489 P.2d 681,683 (1971) (holding that although

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1   the Nevada Supreme Court "has been reluctant to approve injunctive relief where damages may be

2   assessed and recovered, the mere availability of a legal remedy is not enough. The remedy must be

3   adequate.")

4       18.     As such, the facts set forth herein and Nevada law regarding temporary restraining

5   orders (hereinafter referred to singularly as "TRO") and/or preliminary injunctions, Braham

6   respectfully requests that this Honorable Court grant request for issue an injunction to preserve the

7   status quo and to prevent the irreparable harm that will result to Braham and to put a stop to the

8   unjustified anti-competitive restriction on universities that seek to compete for college athletes, and

9   to restore freedom of economic opportunity for himself and other college football players. *Number

10  One Rent-A-Car v. Ramada Inns*, 94 Nev. 779, 780-81, 587 P.2d 1329, 1330 (1978); NRCP 65(b).

11                     **ATTEMPT TO EXHAUST ADMINISTRATIVE PROCEEDINGS**

12      19.     The NCAA permits only member institutions (i.e., four-year institutions),

13  conferences, or committees/subcommittees, not individual athletes, to file and seek legislative

14  waivers to address specific circumstances that may impact an athlete's eligibility. See NCAA Bylaw

15  5.4.1.3[1]

16      20.     Under the circumstances, Braham and his attorney/NIL agent Joseph Benincasa, Esq.

17  have repeatedly requested that Joseph Flores, Senior Associate Athletics Director for Compliance

18  and David Gillum, the Associate Vice-President of Compliance and Research Administration at the

19  University of Nevada, Reno, assist Braham by formally filing a waiver request so that the NCAA

20  can exercise its discretion to waive the Five-Year rule and the JUCO transfer GPA requirement as

21  it applies to Braham. See **Exhibit D.**

22      21.     On or about February 18, 2025, Mr. Flores informed Mr. Benincasa in a telephone

23  conversation and then directly to Braham via a subsequent telephone call that the university was

24  unwilling to file and seek an eligibility waiver on his behalf and that he would need to pursue any

25  remedies on his own, even though they were aware that no such administrative remedies are

26  available directly to him. More specifically, Mr. Flores told Mr. Benincasa and Braham that the

27

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

[1] https://www.ncaa.org/sports/2013/11/18/legislative-relief-waivers.aspx

university believed Braham should "find a lawyer and file a lawsuit against the NCAA instead of looking to the school for help," knowing that without the school's help, the only alternative for Braham was the judicial system. *Id.*

22.    On or about May 5, 2025, Mr. Benincasa again reached out to Mr. Flores via email to confirm whether the University of Nevada, Reno, was still unwilling to file a waiver on Braham's behalf and if filing a lawsuit against the NCAA was the only recommended option; Mr. Flores confirmed the university's continued unwillingness to file and seek a waiver for Braham and stated that if Braham wanted to fight for his final year of eligibility, litigation against the NCAA was the "only path [he] s[aw] available" to Braham and his team. *Id.*

23.    Braham's inability to seek assistance from the NCAA directly, after Mr. Flores and the university's unwillingness to assist, is yet another example of the NCAA erecting procedural barriers that disproportionately burden JUCO athletes, effectively impeding their ability to access or exhaust available remedies if their school is unwilling to assist them.

## JURISDICTION AND VENUE

24.    This Court has jurisdiction over this action under Section 1 of the Sherman Act, 15 U.S.C. § 1, Sections 4 and 26 of the Clayton Act, 15 U.S.C. § 26, and under 28 U.S.C. §§ 1331 and 1337.

25.    This Court may exercise personal jurisdiction over Defendant NCAA because Defendant currently transacts business in the Middle District of Nevada. Defendant and its member institutions conduct athletic competitions, ticket and merchandise sales, television agreements, and other revenue-generating activities as a member of the Mountain West Conference. (*United States District Court for the District of Nevada, LR. 8-1*).

26.    Venue is proper in this district under Section 12 of the Clayton Act, 15 U.S.C. 22, and under 28 U.S.C. § 1391(b)(2).

## THE PARTIES

27.    Braham is a college football player at the University of Nevada, Reno, and resides in Reno, Nevada. Braham was born and raised first in Baltimore, Maryland, and then moved to South Carolina with his grandparents at the start of his high school years. Nevertheless, Braham has played

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1   football since he was growing up in Baltimore, Maryland and beyond; Braham fulfilled his dream

2   of playing college football at the JUCO level, at Hutchinson Community College ("HCC"), one of

3   the nation's leading National Junior College Athletic Association ("NJCAA") football programs,

4   before seeking to transfer to a NCAA Division I college.

5       28.    Braham is the first in his family to not only attend college but also the first to play

6   collegiate sports.

7       29.    The NCAA is an unincorporated association headquartered in Indianapolis, Indiana,

8   and is thus a citizen of Indiana. It governs college athletics nationwide and includes over 1,100

9   member institutions, with more than 350 in Division I. Through its Constitution and Bylaws,

10  including specific Division I Bylaws 12.8, 12.02.6, and 14.3.3, the NCAA and its members have

11  adopted rules regulating all aspects of college sports. These rules are enacted and amended by votes

12  of the member institutions and their governing councils and thus constitute horizontal agreements

13  among competing schools. *See Alston*, 594 U.S. at 79. *Pavia*, 2024 WL 5159888, at *2.

14      30.    Membership in the NCAA is effectively mandatory for any academic institution

15  wishing to participate in elite collegiate athletics. Institutions that fail to comply with NCAA rules

16  face severe penalties, including scholarship reductions, postseason bans, vacated wins, monetary

17  fines, and the most severe penalty a school can receive, a program suspension, commonly known as

18  the "death penalty."

19      31.    The NCAA and its member institutions control the market for elite collegiate

20  athletics. Any athlete seeking to exchange athletic services for educational benefits and the unique

21  advantages of top-tier college sports must, as a practical matter, attend an NCAA Division I

22  institution.

23      32.    More specifically, according to the NFL, "[t]he draft provides a chance for about 250

24  of the nation's finest athletes to live out the dream they have been preparing for all their young lives:

25  a chance to play in the NFL. Seven rounds of selections and an additional 32 compensatory picks

26  / / /

27  / / /

28  / / /

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

awarded to select teams determine who has made the grade."[2]

33.     Notably, NFL draft data from 2023 showed that all draft picks in the 2023 draft were former NCAA athletes.[3]

34.     No viable substitutes exist for the bundle of benefits NCAA Division I schools provide: (i) scholarships covering full or partial education costs; (ii) high-quality academics; (iii) premier training and facilities; (iv) access to top-tier coaching; (v) national exposure through broadcast deals and championships; (vi) NIL monetization opportunities; (vii) competition at the highest collegiate level; and (viii)  the only route to the NFL.

## **FACTUAL BACKGROUND**

### A.  **"The Financial Behemoth"**

35.     The NCAA "is a voluntary, self-governing organization of four-year colleges, universities, and conferences committed to the well-being and development of student-athletes, to sound academic standards and the academic success of student-athletes, and to diversity, equity, and inclusion."2024-25 NCAA Division I Manual, attached hereto as **Exhibit E.** The NCAA and its members collectively issue rules that govern many aspects of athletic competitions among NCAA member schools. *See Alston*, 594 U.S. at 79; *Pavia*, 2024 WL 5159888, at *2.

36.     As the NCAA acknowledged in *Alston*, its member schools collectively enjoy a1 monopoly in the market for student-athlete services, such that its restraints can and do harm competition. With such power, the NCAA has grown into what one court has described as a "financial behemoth," with "revenues often exceeding $1 billion annually." *Id.*;  *Johnson v. NCAA*, 108 F.4th 163, 170 (3d Cir. 2024).

37.     The Supreme Court has characterized the NCAA as a "sprawling enterprise" that generates billions of dollars in revenue each year. *See Alston*, 594 U.S. at 79, 93 (observing that annual television rights for the March Madness basketball tournament brought in close to $1.1

---

[2]https://operations.nfl.com/journey-to-the-nfl/the-next-generation-of-nfl-stars/getting-into-the-game/#:~:text=The%20draft%20provides%20a%20chance,who%20has%20made%20the%20grade.

[3]  https://www.ncaa.org/sports/2015/3/6/estimated-probability-of-competing-in-professional-athletics.aspx


LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

COMPLAINT FOR INJUNCTIVE RELIEF

1  billion in 2016, and the television deal for the Football Bowl Subdivision College Football Playoff

2  was worth approximately $470 million in 2012).

3      38. The NCAA comprises three Divisions: Division I, Division II, and Division III, each

4  of which promulgates its own rules and operating guidelines. These rules include those that determine

5  the eligibility of student-athletes to participate in intercollegiate athletics. Division I teams are the

6  most popular and they attract the most money and the most talented athletes. *Id.* at 79.

7      39. Of the NCAA's approximately 1100 four-year colleges and universities, approximately

8  350 schools compete in Division I. Division I itself is divided, for football competition, into two

9  subdivisions, one of which is the FBS. *Id*. at 80. Division I includes roughly 350 schools divided

10  across 32 conferences. *Id*. at 79. Conferences may enact and enforce conference-specific rules, but

11  these must be consistent with the NCAA's own rules. The NCAA rules governing participation in

12  Division I are generally enacted by the Division I Board of Directors.

13      40. Today, "the NCAA generates approximately one billion dollars in revenues each

14  year.... The FBS conferences have a multi-year media contract with ESPN for the College Football

15  Playoff, the total value of which is $5.64 billion. The 5 conferences with the largest revenues, known

16  as the Power Five Conferences, each generate hundreds of millions of dollars in revenues per year,

17  in addition to the money that the NCAA distributes to them.... [The] SEC made more than $ 409

18  million in revenues from television contracts alone in 2017, with its total conference revenues

19  exceeding $ 650 million that year[]. The revenues of the Power Five [now Power 4] have increased

20  over time and are projected to continue to increase." *See* Compl., *Pavia v. National Collegiate*

21  *Athletic Ass'n*, Civ. No. 24-01336, (M.D. Tenn. Nov. 8, 2024)(preliminary injunction

22  granted)(collectively, "*Pavia* Compl."). A copy of the Complaint is attached as **Exhibit F,** pg. 6.

23      41. It is the NCAA's mission to "provide student-athletes with the opportunity to

24  participate in sports and compete as a vital, co-curricular part of their educational experience.... The

25  basic purpose of the Association is to support and promote healthy and safe intercollegiate athletics,

26  including national championships, as an integral part of the education program and the student-

27  athlete as an integral part of the student body." *See* 2024-25 NCAA Manual, **Exhibit E.** (emphasis

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

added). In other words, the NCAA concedes in their manual that the ability to participate in college sports is both "vital" and "integral" to the four-year college experience. *Id*.

### B.  Junior Colleges are Governed by the National Junior College Athletic Association

42.     In contrast to the four-year institutions governed by the NCAA, excluding NCAA Membership are JUCOs. JUCOs are governed by the National Junior College Athletic Association ("NJCAA").

43.     "The NJCAA's mission is to promote, govern, and foster a competitive environment for two-year college athletics. The NJCAA recognizes the diverse nature of its membership, providing at all times a consistent and inclusive governance structure that provides opportunities for all stakeholders and emphasizes the academic, athletic, and community involvement goals of all student-athletes."[4]

44.     The NCAA and NJCAA have no affiliation. NJCAA president and CEO Christopher Parker describes his relationship with NCAA president Charlie Baker as "nonexistent."[5]

45.     Each year, more than 60,000 student-athletes from 500 member colleges compete in 27 different sports and participate in the NJCAA. While the NCAA generates billions of dollars in revenue while televising nearly all Power 4 conference games, it took the NJCAA until 2022 to reach an agreement with ESPN to nationally televise just one NJCAA game (the JUCO national championship game), with 13 additional games available through an online streaming platform. To be clear, while the NJCAA streams a total of 13 games over its entire season, the NCAA televises 40 games or every single week of the season (not to mention several games on other nights of the week). [6]

46.     Additionally, while the 2024 NIL market for college football is estimated at $1.1 billion, only $6.5 million, less than six-tenths of one percent, went to non-NCAA Division 1 football players. *See* **Exhibit B**, pg. 4.

---

[4] https://www.njcaa.org/about/mission/Mission_statement
[5]     https://www.cbssports.com/general/news/college-coaches-write-letter-urging-ncaa-to-change-stringent-eligibility-requirements-for-juco-athletes/
[6]         https://www.usatoday.com/story/sports/ncaaf/2024/11/02/college-football-schedule-week-10-saturday/75918275007/

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

47.    In short, playing for a JUCO is not a comparable alternative to playing Division I College Football in terms of exposure, either to generate income while in college through NIL Compensation or to National Football League scouts for future career opportunities.

**C. The NCAA is Governed by Self-Created Bylaws That Discriminate Against Junior College Athletes.**

48.    Each NCAA Division maintains its bylaws, with amendments proposed by member institutions. *See* 2024-25 NCAA Division I Manual, **Exhibit E**. at pgs. 14, 17-18. Each NCAA member school is required to "hold itself accountable to support and comply with the rules and principles approved by the membership." *Id.* at pg. 9.

49.    Generally, the NCAA Bylaws require that a student-athlete meet certain eligibility standards. Of relevance to this action are the two eligibility rules in the NCAA Two-Year Guide (*See* **Exhibit C,** pg. 11) and codified in the NCAA Division I 2024-2025 Bylaws that ultimately impact and discriminate against JUCO athletes by discouraging and penalizing those who attend them.

**(i)    NCAA "2-4" or "4-2-4" Transfer GPA Rule**

50.    The NCAA  places an inexplicably more stringent eligibility standard on JUCO athletes with a mandated transfer GPA through what is called the NCAA "2-4" or "4-2-4" Transfer Rule[7]." *See* **Exhibit C,** pg. 11.

51.    The NCAA has maintained stringent, inequitable, and unfair transfer eligibility requirements for JUCO athletes compared to their counterparts at four-year institutions and continues to discriminate against them academically.

52.    For an athlete transferring from JUCO to an NCAA Division I school, a minimum GPA of 2.5 is required, while an athlete transferring from a four-year institution to another four-year institution only needs a 2.0. *Id*. This requirement applies to both first-time transfers from a

---

[7] This more stringent requirement for JUCO athletes is often referred to as the "4-2-4 transfer rule" or the "2-4 transfer rule," and it applies when a JUCO athlete transfers to a four-year school or when a student-athlete transfers back to a two-year institution and then transfers back to a four-year institution. See Exhibit C, Pg. 11.

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1  JUCO and those transferring from a four-year school to a two-year school before returning to a four-

2  year institution. *Id*.

3       53.    If a JUCO athlete does not earn a GPA of at least 2.5 in transferable credits from the

4  student athlete's coursework, the JUCO athlete cannot practice, get an athletic scholarship, or compete

5  until the student athlete sits out for an academic season. *Id*. In essence, this creates an academic inequity

6  for JUCO students that prevents those student-athletes who may have achieved greater academic success

7  than current NCAA athletes from having an opportunity to compete at an NCAA four-year institution.

8                      **(ii)  The Five-Year Rule and Eligibility Clock: NCAA Bylaw 12.8**

9       54.    As further clear evidence of discrimination against JUCO athletes, pursuant to

10  NCAA Bylaw 12.8, an athlete has five (5) years of eligibility to play four (4) seasons of

11  "intercollegiate competition" in the student athlete's chosen sport (the "Five-Year Rule"). The

12  athlete's five-year window is known as an "Eligibility Clock" and it starts to run from the date on

13  which an athlete registers as a full-time student at any collegiate institution[8]" whether or not such

14  institution is a member of the NCAA and whether or not the athlete competes in any sport at the

15  non-NCAA institution. **Exhibit E**, pg. 54-56, NCAA Bylaw 12.8.1. More specifically, the Bylaws

16  provide, in pertinent part:

17       **12.8.1 Five-Year Rule.** A student-athlete shall complete the student-athlete's
      seasons of participation within five calendar years from the beginning of the semester
18       or quarter in which the student-athlete first registered for a minimum full-time
      program of studies in a collegiate institution, with time spent in the armed services,
19       on official religious missions or with recognized foreign aid services of the U.S.
      government being excepted. . . .
20

21       **12.8.1.1 Determining the Start of the Five-Year Period.** For purposes of starting the
      count of time under the five-year rule, a student-athlete shall be considered registered
22       at a collegiate institution . . . when the student-athlete initially registers in a regular
      term (semester or quarter) of an academic year for a minimum fulltime program of
23       studies, as determined by the institution, and attends the student's first day of classes
      for that term.
24

25

26  [8] A "collegiate institution" is defined in Bylaws section 14.02.4 as an institution of higher education that, in
   relevant part, "[i]s accredited at the college level by an agency or association recognized by the secretary of
27  the Department of Education and legally authorized to offer at least a one-year program of study creditable
   toward a degree"; or "[c]onducts an intercollegiate athletics program, even though the institution is not
28  accredited at the college level and authorized to offer at least a one-year program of study creditable toward
   a degree." This definition includes Junior Colleges.

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

55.    The NCAA's Guide for Two-Year Transfers has a section on the Eligibility Clock, where it explains that the purpose of the five-year rule is to "move student-athletes toward graduation in a timely manner." *See* **Exhibit C**, pg. 21. In other words, the NCAA concedes in its guidelines that the Five-Year Rule is not designed for any pro-competitive purpose.

56.    "The irrelevance of the Eligibility Clock start date to competitive balance becomes even more apparent when one realizes that the five-year clock begins to run whether a student plays a sport or not. Under said Bylaw, a student can attend a junior college for two (2) years without playing any sports, obtain an associate's degree, transfer to a four-year NCAA school, and the student still only has three years of eligibility to play three seasons of football, and earn NIL." **Exhibit F**, pg. 8

57.    In contrast, a student who graduates from high school plays football at a prep school for a post-graduate year, and then attends an NCAA school still receives five (5) years of eligibility to play four seasons. *Id*. Similarly, a student who graduates from high school and becomes a professional athlete in another sport can play that other sport for years, then go to college and still have five years of eligibility to play four seasons of a sport, as long as it is a different sport than they played professionally. *Id*.

58.    The NCAA rules do not limit the ability of the former professional athlete to profit from NIL while playing Division I football, even though they have had a chance to physically mature well beyond a typical 18-year-old college freshman. *Id*. For instance, Chris Weinke entered Florida State University as a freshman following a six-year professional baseball career and ended up winning the Heisman Trophy, awarded annually to the most outstanding player in college football, at 28 years of age. [9] Accordingly, it is apparent that the Five-Year Rule does not exist for reasons of competitive balance, or else it would preclude other older athletes from competing in Division 1 NCAA sports. See *Pavia* Compl., **Exhibit F**, pg. 9.

---

[9]  https://en.wikipedia.org/wiki/Chris_Weinke (last accessed on May 21, 2025).

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1

     **(iii)**    **The "Intercollegiate Competition Rule"**

2

     59.    The next relevant rule of eligibility is the four-year limitation on intercollegiate

3

competition (the "Intercollegiate Competition Rule").

4

     60.    Under the Intercollegiate Competition Rule, a student-athlete is forbidden from

5

engaging "in more than four seasons of intercollegiate competition in any one sport." See Bylaws

6

§ 12.8. Although JUCOs are excluded from Division I, the Bylaws define "intercollegiate

7

competition" to include competition at either a two-year or a four-year collegiate institution." See

8

Bylaws § 12.02.6.

9

     61.    The NCAA has provided blanket waivers of the Five-Year and Intercollegiate

10

Competition Rules to institutions in light of certain events. One such blanket waiver was granted to

11

institutions due to the COVID-19 pandemic. This waiver permitted NCAA member institutions to

12

self-apply a waiver of the Five-Year and Intercollegiate Competition Rules for the 2020-2021

13

season.

14

     62.    The NCAA also recently granted institutions a blanket waiver of the Intercollegiate

15

Competition Rule in the wake of the decision of the United States District Court for the Middle

16

District of Tennessee on December 18, 2024, in *Pavia v. NCAA*, No. 3:24-cv-01336, 2024 U.S.

17

Dist. LEXIS 228736 (M.D. Tenn. Dec. 18, 2024).

18

     63.    In *Pavia*, the court granted Diego Pavia ("Pavia"), the current quarterback for

19

Vanderbilt University, a preliminary injunction prohibiting the NCAA from (a) counting a year that

20

Pavia spent playing football at a Junior College as a season of competition for purposes of the

21

Intercollegiate Competition Rule; and thereby (b) barring Pavia, who had otherwise played just

22

three years of Division I college football, from playing for Vanderbilt in the 2025-2026 season.

23

     64.    The court found an injunction appropriate due to the clear anticompetitive effects the

24

NCAA's interpretation of the Intercollegiate Competition Rule—*i.e.*, by counting Pavia's year of

25

Junior College football as a season of competition—would have on Junior Colleges and student-

26

athletes:

27

                First, the challenged rules limit the NCAA Division I eligibility of

28

                Student-athletes who attended junior college to two or three seasons

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

while student-athletes who attend only NCAA Division I institutions have four years of Division I eligibility. This Rule gives a competitive advantage to NCAA Division I member schools over junior colleges—and thus the football players at each level—even though they are treated the same in terms of eligibility.

The disparate treatment of these two groups also results in a distortion of the labor market for NCAA Division I football players by pushing student-athletes to attend NCAA member institutions so that they may enjoy a full four seasons of NCAA Division I eligibility even if junior college might otherwise be a better choice academically or athletically. Similarly, students who attend junior college for one year and are considering whether to continue their junior college education and obtain an associate degree or transfer to a NCAA Division I institution may be swayed in their decision by the prospect of relinquishing another year of NCAA eligibility and the accompanying competitive advantages and NIL compensation. The rule requiring forfeit of NCAA eligibility and associated NIL opportunities for junior college attendance discounts that choice.

NCAA Division I member institutions compete directly with NJCAA schools for football talent. NCAA Division I offers a prospective football player significant advantages over junior college football—more exposure, potentially better competition and coaching, and financial advantages due to the NIL opportunities disproportionately offered to Division I athletes.

In summary, the eligibility bylaws induce potential football players to attend NCAA institutions rather than non-NCAA institutions even when non-NCAA institutions, such as junior colleges, might be in their best interest. Therefore, the rule harms student athletes when they are making decisions on whether to attend a junior college or an NCAA institution.

*Pavia*, 2024 U.S. Dist. LEXIS 228736, at \*22-23 (cleaned up).

65.     The *Pavia* decision further found that the NCAA's interpretation of the Intercollegiate Competition Rule harmed consumers. In so ruling, the court reasoned that the "restriction on the eligibility of former junior college student-athletes to compete at the Division I level harms the competitiveness of the teams by limiting the number of years these players can compete at the Division I level." *Id.* at \*24.

66.     Following the December 18, 2024, decision in *Pavia*, the NCAA provided a blanket waiver (the "Pavia Waiver") of the Intercollegiate Competition Rule to any student-athlete who (i)

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

157742078.1                          16                          Case No.
COMPLAINT FOR INJUNCTIVE RELIEF

competed for a Junior College; (ii) would have been eligible to compete in the 2025-2026 season but for their time competing for a Junior College; and (iii) met all other eligibility criteria. *Id*.

67.    But for the NCAA's continued and ongoing interpretation and application of the Five-Year Rule to Braham, he would qualify for the *Pavia* Waiver.

**D.    Braham's Background and Collegiate Sporting Experience from 2019 through the 2024-2025 Season.**

68.    In May 2019,  Braham graduated from High School from Westwood High School in Blythewood, South Carolina, where he competed all four years. Braham finished with 79 career catches for 1,370 yards and 17 touchdowns. Braham was a three-star rated prospect by ESPN and 247 and overall rated No. 3 wide receiver prospect, No. 28 nationally, and No. 8 in South Carolina by 247Sports.

69.    **The 2019-2020 Season**: In August 2019, Plaintiff enrolled at HCC for his first year of collegiate athletics. In the Fall of 2019, Plaintiff played in 7 games. Braham finished his first year with 16 catches for 223 yards and 2 touchdowns.

70.    **The 2020-2021 Season:** In August 2020, Plaintiff re-enrolled at HCC for his second year of collegiate athletics. However, the Fall 2020 season was postponed and moved to the Spring of 2021 due to COVID-19. In the Spring of 2021,  Plaintiff and HCC won the NJCAA championship. After finishing his second year ranked No. 5 nationally in touchdowns and No. 19 in receptions, Braham was offered a scholarship to attend and play NCAA Division I football for West Virginia University ("WVU") and he willingly accepted the opportunity to rise to Division I competition.

71.    Right before formally transferring to WVU, Braham was informed by HCC that he was ineligible to transfer to WVU because he had a 2.47 GPA and was 0.03 short of the NCAA JUCO GPA requirement to transfer to a four-year institution. Notably, had Braham been transferring from one four-year institution to another, he would have been eligible to compete immediately, as he clearly surpassed the NCAA's minimum 2.0 GPA transfer requirement.

72.    **The 2021-2022 Season:** As a result of Braham's GPA and inability to transfer and play Division I football despite being offered a scholarship by the University of West Virginia, in August 2021, Braham re-enrolled at HCC of his own accord to take additional courses to increase his

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

157742078.1                                    17                                    Case No.
COMPLAINT FOR INJUNCTIVE RELIEF

1   GPA. By the Spring of 2022, Braham had successfully increased his GPA to a level above 2.5 and

2   transferred to WVU. Unfortunately, Braham was unable to compete for the University of West

3   Virginia in the fall of 2021 and play Division I football.

4        73.    **The 2022-2023 Season**: Having successfully qualified by satisfying the NCAA's

5   equitable GPA transfer requirement and after missing out on an entire season of football in the fall of

6   2021, Braham played 11 games for WVU during the 2022 season. Plaintiff ended his third year (first

7   year at an NCAA school) of collegiate sports as the fifth-leading receiver for WVU with 14 catches

8   for 147 yards, with a long catch of 30 yards.

9        74.    **2023-2024 Season:** Braham played in his second season of NCAA football with the

10  University of West Virginia. He had 3 receptions for 17 yards.

11       75.    **2024-2025 Season:** Braham transferred to the University of Nevada-Reno for his third

12  season of NCAA football. Braham had 56 receptions for a total of 724 yards and 4 touchdowns during

13  the 2024 season, his third season of Division I competition.

14       **E. Braham's Inability to File for a Waiver to Compete, and the Need for Immediate**

15  **Injunctive Relief**

16       76.    Braham asked the University of Nevada, Reno, to file a waiver on his behalf and

17  request the NCAA to waive enforcement of the NCAA 2-4 Transfer Rule's GPA Restriction and the

18  Five-Year Rule based upon the Diego decision and the NCAA policy shift regarding JUCO

19  experience, which would automatically entitle him to eligibility for the 2025-26 season. In essence, if

20  the JUCO eligibility requirement had been waived, or if Plaintiff had simply been held to the 2.0 GPA

21  standard applicable to four-year institutions, Braham would be able to compete in an additional

22  season." *Elad*, 3:25-cv-01981-ZNQ-JTQ,  U.S. Dist. Ct. of N.J, Opinion, (April 25, 2024) at 12,

23  ("[Athlete]  is likely to suffer substantial, immediate, and irreparable harm should he be prevented

24  from playing this season").

25       77.    Given the  University of Nevada, Reno's refusal to assist Braham and file an appeal

26  on his behalf seeking an eligibility waiver for the 2025-26 season on his behalf, Braham has been

27  forced to file this action to obtain injunctive relief from this Court. The need for such relief is urgent.

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

78.    Division I football programs began spring practice for the 2025-26 football season on or around March 2025. These spring practices are critical to both the team and Braham, as they would facilitate his integration into the team's overall strategy and offensive game plan and enable Braham to develop a rapport with a Division I coaching staff and teammates. Braham has already suffered harm by not being able to participate in the Spring season or the 2021 season when he was considered academically ineligible to compete.  It is Braham's understanding that if the NCAA does not grant him a waiver or he is not otherwise deemed eligible prior to the start of summer training, the schools that have offered him a spot on their team will be forced to replace him with another player and he will lose his opportunity to play for next season.

**F. Relevant Markets**

79.    As the court in *Pavia* found, the relevant market for purposes of this type of case is "the labor market for college football athletes in general and NCAA Division I football specifically." *Pavia,* 2024 U.S. Dist. LEXIS 228736, at *20.

80.    The United States is the relevant geographic market, and the NCAA and its member institutions are located throughout the geographic market.

81.    College athletes compete to earn spots on NCAA Division I athletic teams, and NCAA member institutions compete with other institutions to attract and secure top-level athletes. NCAA member institutions secure college athletes through the provision of various in-kind benefits, including full and partial scholarships, advanced academic programming, access to state-of-the-art training and rehabilitation facilities, and premier instruction from knowledgeable coaching staff.

82.    Participating in NCAA Division I athletics provides significant benefits and opportunities to college athletes, including: (1) the ability to maximize their chances to play professional sports by providing extensive exposure to scouts; (2) the opportunity to compete against the nation's best amateur athletes; (3) national publicity through nationwide broadcasting of sporting events; (4) full and partial scholarships; (5) the opportunity to earn personal sponsorship opportunities and marketing deals; (6) the ability to capitalize on NIL agreements, which sometimes provide

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1  millions of dollars in financial benefits; and (7) the receipt of top-tier academic support through

2  student-athlete assistance programs

3        83.     The most talented student-athletes have no practical alternatives in the relevant

4  markets to participating in NCAA Division I athletics. Especially those wishing to compete for a spot

5  in the NFL draft.

6        84.     The NCAA exercises monopsony power in this market. *Elad* at 15. (citing *Alston*.)

7        85.     The NCAA has sole rule-making authority and maintains exclusive power over the

8  promulgation of rules and regulations for its member institutions.

9        86.     As the sole rule-making authority, the NCAA exercises power in the relevant market,

10  and it is anticompetitive for the NCAA to count students' play at a junior college against their NCAA

11  year limit to participate in college athletics. *Elad,* Exhibit A, pg. 15.

12        87.     Although the NCAA is structured as a nonprofit organization, its member institutions

13  derive substantial financial benefits from their relationships with student-athletes. These institutions

14  generate revenue from hosting athletic events, merchandise sales, lucrative broadcasting agreements,

15  and increased enrollment interest. In contrast, student-athletes receive only limited benefits, as

16  outlined above.

17        88.     Accordingly, the transactions between member institutions and student-athletes are

18  inherently commercial in nature and fall within the purview of the Sherman Act.

19        89.     Additionally, in *Elad*, the court found that the JUCO Rule is commercial in nature

20  because a NIL agreement is a commercial transaction and the JUCO Rule limits who is eligible to

21  play and therefore to negotiate a NIL agreement (citing *Pavia*, 2024 WL 5159888, at *6.).

22  Selectively limiting JUCO students from that pool necessarily has a commercial effect. *See* Exhibit

23  A, pg. 13.

24        **G. Anti-Competitive Effects**

25        90.     The NCAA establishes and enforces rules purportedly designed to ensure fairness and

26  promote student-athlete welfare, all under the guise of preserving amateurism. These rules are adopted

27  through votes by the NCAA Division I Council and member institutions, amounting in practice to

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

horizontal agreements between the NCAA and its member schools, which are otherwise competitors in the market for student-athlete services.

91.     As the exclusive governing authority over intercollegiate athletics, the NCAA leverages its dominant market position to impose eligibility and academic requirements that disproportionately restrict and burden JUCO athletes. By counting JUCO participation against the NCAA's five-year eligibility clock and subjecting JUCO athletes to more stringent GPA standards than those applied to NCAA athletes transferring from four-year institutions, the NCAA creates academic disparities and artificially restricts the career mobility of JUCO athletes.

92.     The NCAA's conduct violates Section 1 of the Sherman Act by producing direct anticompetitive effects that harm JUCOs, reduce opportunities for student-athletes, and diminish consumer choice in the college athletics marketplace.

93.     The anticompetitive effect of this policy is to "discourage and penalize student-athletes from attending Junior Colleges[,] harm the Junior Colleges' ability to compete with Division I schools for talented athletes, and limit the choice of educational institutions available to student-athletes." *See Elad,* Exhibit A,  pg. 15.

94.     Allowing the NCAA to apply the Five-Year Rule to encompass time spent at Junior Colleges would cause significant anticompetitive harm to Junior Colleges, Braham, and similarly situated student-athletes participating in the labor market. More specifically, as the court in *Pavia* found, enforcing NCAA rules that discourage or penalize student-athletes from attending Junior Colleges harms the Junior Colleges' ability to compete with Division I schools for talented athletes and limits the choice of educational institutions available to student-athletes. As held in *Elad,* "[R]estrictions on who can compete (and earn NIL compensation) and for how long necessarily have anticompetitive effects. *Id.* at 16.

95.     Further, consumers who attend NCAA athletic events or watch them on television or streaming services will also be negatively affected by the NCAA's arbitrary and unreasonable conduct. It is reasonable to expect that fan interest in college athletics will dissipate if the governing body tasked with regulating and ensuring fair competition fails to do so. The most talented prospective student-athletes may be deterred from attending Division I schools if they believe the NCAA does not

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1 promote fair competition and does not treat athletes fairly, especially with the growing availability of

2 other professional sports opportunities in the United States and elsewhere. Moreover, as the court

3 found in *Pavia*, consumers of Division I intercollegiate events will be harmed because the level of

4 competitiveness of Division I teams will be reduced due to the restrictions placed on elite athletes who

5 attend Junior Colleges. *Pavia*, 2024 WL 5159888.

6     96.    Additionally, JUCO athletes are further disadvantaged by being subjected to unfair and

7 inconsistent eligibility procedures that directly impair their ability to pursue professional athletic

8 careers. Nearly every athlete selected in the NFL Draft originates from an NCAA institution,

9 underscoring the NCAA's gatekeeping role in professional sports access. The structure fails to

10 promote fair competition and deprives JUCO athletes of equitable treatment, leaving them with only

11 one viable pathway to professional advancement: NCAA membership.

12     97.    All of this gives a recruiting advantage to NCAA Division I member schools over

13 JUCOs, even though they are treated the same in terms of eligibility. *Elad,* at 15.  Removing players

14 with the JUCO Eligibility Limitation Bylaws distorts the labor market by reducing competition,

15 depressing the prices at which Division I schools can acquire athletes, and the pay athletes can earn in

16 NIL agreements or their long-term careers. *Pavia*, 2024 WL 5159888, at *10.

17     **H.    NCAA's Rule of Restitution**

18     98.    Section 12.11.4.2 of the NCAA Bylaws—commonly known as the "Rule of

19 Restitution"—provides as follows:

**12.11.4.2 Restitution**. If a student-athlete who is ineligible under the terms of the bylaws or other legislation of the Association is permitted to participate in intercollegiate competition contrary to such NCAA legislation but in accordance with the terms of a court restraining order or injunction operative against the institution attended by such student-athlete or against the Association, or both, and said injunction is voluntarily vacated, stayed or reversed or it is finally determined by the courts that injunctive relief is not or was not justified, the Board of Directors may take any one or more of the following actions against such institution in the interest of restitution and fairness to competing institutions:
 (a) Require that individual records and performances achieved during participation by such ineligible student-athlete shall be vacated or stricken;
(b) Require that team records and performances achieved during participation by such ineligible student-athlete shall be vacated or stricken;
(c) Require that team victories achieved during participation by such ineligible student-athlete shall be abrogated and the games or events forfeited to the opposing institutions;
 (d) Require that individual awards earned during participation by such ineligible student-athlete shall be returned to the Association, the sponsor or the competing

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

institution supplying same;

(e) Require that team awards earned during participation by such ineligible student-athlete shall be returned to the Association, the sponsor or the competing institution supplying same;

(f) Determine that the institution is ineligible for one or more NCAA championships in the sports and in the seasons in which such ineligible student-athlete participated;

(g) Determine that the institution is ineligible for invitational and postseason meets and tournaments in the sports and in the seasons in which such ineligible student-athlete participated;

(h) Require that the institution shall remit to the NCAA the institution's share of television receipts (other than the portion shared with other conference members) for appearing on any live television series or program if such ineligible student-athlete participates in a contest selected for such telecast, or if the Board of Directors concludes that the institution would not have been selected for such telecast but for the participation of such ineligible student-athlete during the season of the telecast; any such funds thus remitted shall be devoted to the NCAA postgraduate scholarship program; and

(i) Require that the institution that has been represented in an NCAA championship by such a student-athlete shall be assessed a financial penalty as determined by the Committee on Infractions.

99.    If the NCAA determines a student-athlete is ineligible, but a court issues an injunction allowing them to play, the Restitution Rule comes into play if the court's decision is later overturned.

100.    The Rule of Restitution allows the NCAA to retroactively punish a student-athlete and the member school the student athlete attends (as well as the student-athlete's teammates with no affiliation with the waiver or court decision) if the student-athlete and the member school rely on a court-issued TRO or preliminary injunction enjoining unlawful conduct by the NCAA and mandating that the student-athlete be permitted to participate in athletic competition if the TRO or injunction is later revoked for any reason, the student-athlete and the school can be punished.

101.    The clear purpose and effect of the Rule of Restitution is to deter challenges to the NCAA's anti-competitive and improper rules and rulings by making it impossible for student-athletes and member schools to rely on validly entered court orders and to obtain meaningful injunctive relief. These penalties can be significant, impacting an institution's athletic program and reputation.

102.    Indeed, in light of the Rule of Restitution, in short a form of extortion, colleges and universities typically do not permit a student-athlete to participate in athletic competition even if he/she obtains a TRO or preliminary injunction finding that an NCAA ruling is likely invalid and enjoining the NCAA from enforcing that unlawful restraint.

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

103. The Rule of Restitution has been highly criticized. "What is most interesting is that the NCAA regulatory structure denies athletes rights as citizens under U.S. and state law," said Ellen Staurowsky, a professor of sport management at Ithaca College

104. "It denies athletes the benefits of what those favorable court rulings could be. If you get an injunction that would allow you to play, and then you are barred from playing because the school fears they may have to pay restitution later on, it traps you in a space where you effectively have no citizenship."[10]

105. As a result, courts have enjoined the NCAA from enforcing the Rule of Restitution against student-athletes and their respective institutions who rely on a temporary restraining order or preliminary injunction when participating in intercollegiate athletics. *See Williams v. NCAA*, No. 24-cv-614, 2024 U.S. Dist. LEXIS 18479, at \*9 (D.N.J. Feb. 2, 2024); *Pavia,* 2024 U.S. Dist. LEXIS 228736, at \*36; *Ohio v. NCAA*, 706 F. Supp. 3d 583, 601- 02 (N.D.W.V. 2023).

106. As held in *Elad*, the Restitution Rule must be enjoined for its injunction of the JUCO Rule to have a meaningful effect. *See Elad,* Exhibit A, pg. 20.

107. For the preliminary injunctive relief requested by Braham to be effective, this Court must enjoin the NCAA from enforcing the Rule of Restitution for complying with an order granting that relief.

**I. The Irreparable Harm to Braham**

108. Braham will suffer substantial irreparable harm if the Court does not grant the preliminary injunction with temporary restraints requested in this action, which would enable him to immediately join a Division I program and continue his promising football career during the 2025 football season.

109. As held in *Elad*, "[a] loss of [an athlete's] NIL agreement if he is unable to play this season can be quantified, but his lost opportunity to play a year of Division I football [] is incalculable in terms of personal experience. This season [] is a chance for [him] to build memories and lasting relationships both on and off the field." *See Elad,* Exhibit A, pg. 17.

---

[10] https://www.vice.com/en/article/how-a-little-known-ncaa-rule-shuts-athletes-out-of-the-legal-system/

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

110.     By contrast, if the Court does not grant Braham the requested injunctive relief, he will be unable to play in his 2025-26 season. He will thus be denied the opportunity those games present to gain the attention and acclaim that can only be obtained playing for a Division I football team in one of college football's most prestigious and widely covered conferences, to take advantage of the NIL deal he was offered, and to increase his chances of earning a contract to play professional football following the 2025-26 season. Missing out on these opportunities is the very definition of irreparable harm, as was recently recognized in *Williams v. NCAA*, 2024 U.S. Dist. LEXIS 18479, at *7-8 (D.N.J. Feb. 2, 2024).

111.     Unless he is assured that he will be eligible to play during the 2025-26 season, Braham will also lose the opportunity to participate in any remaining days of training before returning for formal summer training camp in actual preparation for the 2025 season.  All of these missed training opportunities would also harm Braham irreparably, as it would deprive him of critical and irreplaceable opportunities to become integrated into the program's defense and the team as a whole. Further, if Braham is not declared eligible to play in the 2025-26 season these programs will sign another player at his position (wide receiver) through the transfer portal to fill his roster spot; in that event, Braham will lose the opportunity to play Division I college football this coming season regardless of how his eligibility status is ultimately resolved.

112.     As held in *Elad*, "this injunction is potentially [the JUCO athlete's] *only* opportunity to complete his Division I career and transition into the NFL." *See Elad,* Exhibit A, pg. 18.

113.     Despite the obvious and immediate harm that Braham would suffer if not granted the requested waivers, the NCAA has refused to allow him to even apply for a waiver of the Five-Year Rule (and thus also refused to grant him the Pavia Waiver, which is dependent on the waiver of the Five-Year Rule). The NCAA has done so—confusingly and inconsistently—even though it granted the Pavia Waiver on a blanket basis for purposes of the Intercollegiate Competition Rule.

### J. Balance of the Equities

114.     As set forth above, Braham "is likely to suffer substantial, immediate, and irreparable harm should he be prevented from playing this season. The NCAA, by contrast, would suffer little harm insofar as, should they later succeed on the merits, they can terminate [Braham's] eligibility."

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1   *See Elad,* Exhibit A, pgs. 18-19.("Court finds that the balance of the equities weighs heavily in Elad's

2   favor.")

3          115.    This Court's immediate intervention is needed to right this wrong.

4          **K. Public Interest**

5          116.    There is a compelling public interest in promoting fair competition and equal

6   opportunities for all collegiate athletes, regardless of division or sport. The NCAA's discriminatory

7   eligibility rules and waiver procedure not only impact Division I football but also reverberate across

8   all divisions (II and III) and sports, disproportionately harming student athletes seeking to transfer for

9   better opportunities. These rules degrade the quality of competition available to both the public and

10  student bodies and ultimately impair the integrity of college athletics. The ripple impacts extend to the

11  professional level, impacting the NFL Draft and hindering athletes' ability to benefit from NIL

12  opportunities, thereby restricting their livelihood and long-term career prospects.

13         117.    In order to prevent illegal antitrust acts, "free and fair competition in the labor markets

14  is essential to the American economy." *Elad*; *Williams v. Nat'l Collegiate Athletic Ass'n*, Civ. No. 24-

15  1098, 2024 WL 397760, at *3 (D.N.J. Feb. 2, 2024).

16                            **LEGAL ARGUMENT**

17                              **COUNT I.**

18                  **(Violation of § 1 of the Sherman Act)**

19         118.    Braham incorporates and realleges the allegations contained in Paragraphs 1 -117 of

20  this Complaint as fully set forth herein.

21         119.    The NCAA, by and through its officers, directors, employees, agents or other

22  representatives, has illegally restrained and suppressed competition in the relevant markets through its

23  refusal to waive JUCO Eligibility Limitation Bylaws as it applied to Braham's two (2) years attending

24  a Junior College. The threat posed by the NCAA having the license to bar student-athletes from

25  realizing the opportunities they have earned without logical justification stifles the market's ability to

26  flourish.

27

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

120.     As a direct result of the NCAA's ability to prevent an athlete from exhausting their administrative remedies to even request a waiver, the NCAA will establish a precedent that it may unreasonably restrict student-athletes' ability to participate in the relevant labor market.

121.     The NCAA's position results in no benefits to competition in Division I collegiate athletics for the NCAA's member institutions, college athletes, or consumers of NCAA athletic contests. The NCAA's position is logically inconsistent with its own decision to grant student-athletes a blanket waiver in these circumstances for purposes of the Intercollegiate Competition Rule.

122.     The NCAA's anti-competitive acts were intentionally directed at the United States market and have had a substantial and foreseeable effect on interstate commerce.

## Count II.

### (Breach of Contract)

123.     Braham incorporates and realleges the allegations contained in Paragraphs 1 -122 of this Complaint as fully set forth herein.

124.     The University of Nevada, Reno, is a member of the NCAA Division I. As such, it has agreed to submit to and abide by the NCAA's rules and regulations in exchange for the benefits of NCAA membership, such as participation in high-level intercollegiate athletic competitions. Furthermore, it has agreed to subject itself to NCAA discipline for any failure to comply with its rules and regulations.

125.     Braham, as a student-athlete enrolled at the University of Nevada, Reno, who is subject to the same NCAA rules and regulations, is an intended third-party beneficiary of the contractual relationship between it and the NCAA.

126.     The NCAA has a contractual obligation to Braham, as an intended third-party beneficiary, to enforce its rules and regulations fairly, consistently, and reasonably.

127.     As detailed above, the NCAA unfairly and unreasonably prohibits student athletes from submitting their waiver requests, instead requiring that the institution initiate and control the waiver process, even when the matter directly impacts the student. This institution-driven framework disregards the interest of the individual athlete and offers no alternative mechanism when a member's situation declines, without explanation, to pursue a waiver. As a result, student athletes are left without

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1  any meaningful avenue to exhaust administrative remedies, jeopardizing their eligibility, careers, and
2  future livelihood.

3      128.    Additionally, the NCAA is treating the JUCO Eligibility Bylaws as valid and
4  enforceable, but the Pavia ruling makes clear that it is not.

5      129.    As a result, the NCAA's insistence that the seasons Braham spent playing football at
6  a JUCO count as intercollegiate competition for purposes of the JUCO Eligibility Limitation Bylaws
7  is directly contrary to its promise to enforce and adjudicate its rules fairly.

8      130.    Braham's current ineligibility for the 2025-26 Division I college football season, based
9  on the Five-Year Rule, clearly indicates that the NCAA has breached its contractual obligations to
10 him because no NCAA rule or regulation in existence authorizes or permits those actions.

11     131.    As an intended third-party beneficiary of the University of Nevada, Reno's agreement
12 to be bound by the NCAA rules and regulations, Braham has suffered and continues to suffer
13 substantial and irreparable harm as a result of the NCAA without any valid contractual authority.
14 Unjustly preventing Braham from playing football during the 2025-26 season deprives him of the
15 once-in-a-lifetime opportunity to compete in Division I football games, improve his skills, support his
16 teammates, and showcase his talents to future professional employers. Specifically, Braham will be
17 unable to compete in athletic competition and avail himself of the myriad opportunities that emanate
18 from his participation, including lucrative NIL rights.

## PRAYER FOR RELIEF

19
20     WHEREFORE, Braham respectfully requests Judgment in his favor and against the NCAA as
21 follows:

22     A.    Declaring that (i) the NCAA's application of the 2-4 Transfer Rule GPA Requirement
23 and Five-Year Rule, and  to include time spent at Junior Colleges, violates the Sherman Act;
24 and (ii) Braham is eligible to compete at a Division I institution during the 2025-26 season;

25     B.    Preliminarily and permanently enjoining the NCAA to immediately issue a waiver
26 request to enable Braham to compete at a Division I institution during the 2025-26 season;

27     C.    Preliminarily and permanently enjoining the NCAA from enforcing the 2-4 Transfer
28 Rule GPA Requirement and Five-Year Rule to include time spent at Junior Colleges;

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

D.      Preliminarily and permanently enjoining the NCAA from enforcing the Rule of Restitution against Braham and any institution for which Braham plays intercollegiate athletics from complying with and/or relying on any injunctive order entered by this Court; and

E.      Awarding Braham compensatory and punitive damages, attorneys' fees and costs, prejudgment and post-judgment interest, and such other and further relief as the Court may deem equitable and just.

DATED this 23rd day of May, 2025.

LEWIS BRISBOIS BISGAARD & SMITH LLP

By    _____/s/ Brandon Wright, Esq._____
BRANDON D. WRIGHT
Nevada Bar No. 13286
5555 Kietzke Lane, Suite 200
Reno, Nevada 89511
Tel. 775.399.6383

GREGG E. CLIFTON, ESQ.
(PRO HAC VICE PENDING)
Gregg.clifton@lewisbrisbosi.com
LEWIS BRISBOIS BISGAARD & SMITH, LLP
2929 North Central Avenue, Ste. 1700
Phoenix, AZ 85012
Telephone: 857.313.3950

Attorneys for Plaintiff
CORTEZ BRAHAM, JR.,

1

<u>**INDEX OF EXHIBITS**</u>

2

3

EXHIBIT A    *Elad v. National Collegiate Athletic Ass'n*    23 pp.
            3:25-cv-01981-ZNQ-JTQ
            New Jersey Federal District Court Opinion

4

5

EXHIBIT B    NIL-AT-3-The Annual Dorse Report    17 pp.

6

EXHIBIT C    NCAA Guide for Two-Year Transfers 2024-2025 Guide    4 pp.
            Pages 1, 11 and 21

7

EXHIBIT D    Affirmation of Joseph Benincasa, IV    11 pp.

8

9

EXHIBIT E    2024-25 NCAA Division I Manual    16 pp.
            Pages x,xii,1,9,14,17-18,34,54-56,65-66 and 149

10

EXHIBIT F    *Pavia v. National Collegiate Athletic Ass'n*    35 pp.
            Civ No. 24-01336 (M.D. Tenn. Nov. 8, 2024)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

157742078.1

Case No.

COMPLAINT FOR INJUNCTIVE RELIEF