UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| CORTEZ BRAHAM, JR., | Case No. 3:25-cv-00253-MMD-CSD |
| Plaintiff, | ORDER |
| v. | |
| NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, | |
| Defendants. | |

## I.    SUMMARY

Plaintiff Cortez Braham, Jr. sued Defendant National Collegiate Athletic Association ("NCAA") alleging violations of federal antitrust laws and seeking to block enforcement of the NCAA's Junior College Eligibility Limitation Bylaws, including: (1) the Five-Year Rule (Bylaw 12.8.1); (2) the 2-4 Transfer GPA Rule (Bylaw 14.5.4.3(d)); and (3) the Rule of Restitution (Bylaw 12.11.4.2). (ECF No. 1.) Before the Court is Braham's motion for a temporary restraining order ("TRO") and/or preliminary injunction ("PI"). (ECF No. 8 ("Motion")[1].) Because Braham has shown that he is likely to succeed on the merits of his claim and that he will be irreparably harmed absent preliminary injunctive relief, the Court necessarily finds that the balance of equities tips in his favor and that such relief serves the public interest. Accordingly, the Court will grant the Motion.

---

[1] Defendant filed a response (ECF No.22) and Plaintiff replied (ECF No. 23). The Court also set an expedited briefing schedule and hearing on the Motion ("the Hearing"). (ECF No. 13.) During the Hearing, the Court granted Defendant's motion to file supplemental authority. (ECF No. 26.) On July 17, 2025, Defendant filed a second motion for leave to file notice of supplemental authority—the Seventh Circuit Court of Appeals' decision in *Fourqurean v. National Collegiate Athletic Association* issued on July 16, 2025. (ECF No. 27.) The Court grants that motion (ECF No. 27) to the extent it notifies the Court of the Seventh Circuit's decision, reversing the lower court's decision discussed in Defendant's response (ECF No. 22 at 24 n. 5).

1

## II.    BACKGROUND

Braham is a first-generation college student and collegiate athlete. (ECF No. 8 at 2; ECF No. 8-1 at 8.) In May 2019, Braham graduated from Westwood High School in Blythewood, South Carolina, where he was rated a three-star prospect by ESPN. (ECF No. 1 at 17.) In August 2019, Braham began his college athletic career as a Division I ("DI") wide receiver at Hutchinson Community College ("HCC")—a junior college ("JUCO")[2]—where he played for the 2019-2020 season. (ECF No. 1 at 17; ECF No. 8 at 2.) In his second year at HCC (Fall 2020), the fall season was postponed to Spring 2021 due to the COVID-19 pandemic.[3] (ECF No. 1 at 17; ECF No. 8-1 at 8.) In Spring 2021, Braham played a second season at HCC and received a scholarship offer to transfer and play NCAA DI football at West Virginia University ("WVU"). (ECF No. 1 at 17; ECF No. 8-1 at 8.)

Shortly before transferring to WVU, Braham was notified that his 2.47 GPA fell short of the NCAA's 2.50 GPA requirement for JUCO transfers under the "2-4 Transfer Rule" (Bylaw 14.5.4.3(d)). (ECF No. 1 at 17; ECF No. 8 at 2; ECF No. 8-5 at 2-3.) Under the 2-4 Transfer Rule, a student-athlete transferring from a JUCO school to an NCAA DI school must have a minimum GPA of 2.50, whereas a student-athlete transferring between NCAA four-year institutions need only have a 2.0 GPA. (ECF No. 8-2 at 3; ECF No. 8-1 at 6.) Accordingly, the higher GPA requirement for JUCO athlete-transfers rendered him ineligible to compete at the DI level. (ECF No. 8-1 at 8.) As a result, in Fall 2021, Braham

---

[2]Unlike the four-year collegiate institutions governed by the NCAA, JUCOs are two-year institutions governed by the National Junior College Athletic Association ("NJCAA"). (ECF No. 1 at 11.)

[3]Braham played football at HCC for two seasons, but one of those seasons was during the 2020-2021 COVID-19 pandemic. The NCAA issued a blanket waiver permitting member institutions to self-apply a waiver of the Five-Year Rule and the Intercollegiate Competition Rule (ICR) for the 2020-2021 season. (ECF No. 1 at 15; ECF No. 8-1 at 7; ECF No. 22 at 13.) In effect, the Spring 2021 season did not count towards the four seasons of competition limit or five-year eligibility window. (*Id.*) As such, the parties agree that, under the existing NCAA eligibility rules, only one of Braham's two years of junior college football "counts" toward the eligibility clock.

1    remained at HCC, where he sat out from athletics to take additional coursework and, by

2    Spring 2022, successfully raised his GPA above 2.50. (ECF No. 1 at 17-18; ECF No. 8-1

3    at 8; ECF No. 22 at 13.) Thus, Braham played a total of two full seasons (one of which

4    was waived under the NCAA's COVID-19 blanket waiver) at the JUCO level before

5    transferring to an NCAA DI institution.

6         In Fall 2022, Braham regained eligibility and played for WVU for his first full NCAA

7    season. (ECF No. 1 at 18; ECF No. 8-5 at 3.) In Fall 2023, Braham returned to WVU,

8    where, due to "familial hardship[s]"[4] (ECF No. 8-5 at 3), he played only a partial season,

9    which did not count toward the NCAA's four seasons of competition limit under the

10   Intercollegiate Competition Rule ("ICR").[5] (ECF No. 1 at 18; ECF No. 8-1 at 8; ECF No. 22

11   at 13.) In Fall 2024 (2024-2025 season), Braham transferred to the University of Nevada,

12   Reno ("UNR")—an NCAA DI institution—for his second full NCAA season. (ECF No. 8-1

13   at 8-9; ECF No. 8-5 at 3; ECF No. 22 at 13.)

14        At the Hearing, Braham did not dispute that the below chart provided in Defendant's

15   response accurately reflects his total seasons of competition and years of eligibility under

16   the current NCCA bylaws, showing that Braham used two years at the JUCO level and

17   three years at the DI level, maxing out his five years of eligibility. (*See* ECF No. 22 at 13.)

18   ///

19   ///

20   ///

21   ///

22   ///

23

24        [4]Under the Redshirt Rule (Bylaw 12.8.3.1.6), football players are allowed to play up
     to four games per season without losing a year of eligibility. *See Pavia v. Nat'l Collegiate*
25   *Athletic Ass'n*, 760 F.Supp.3d 527, 542 (M.D. Tenn. 2024). Here, Braham played in no
     more than four games in the 2023-2024 season. (ECF No. 8-5 at 3.)
26

27        [5]Under the ICR (Bylaw 12.8), "[a] student-athlete shall not engage in more than four
     seasons of intercollegiate competition in any one sport." (ECF No 8-6 at 11; ECF No. 8-1
28   at 7.)

| Cortez Braham's College Football Career | | | | |
|---|---|---|---|---|
| Year | Enrolled Full Time | Played Football | Counts Towards 4 Seasons of Competition | Counts Towards 5 Years of Eligibility |
| 2019 | Hutchinson CC (JUCO) | Full Season | Yes (1) | Yes (1) |
| 2020 (COVID) | Hutchinson CC (JUCO) | Full Season (Spring 2021) | No (COVID Waiver) | No |
| 2021 | Hutchinson CC (JUCO) | No | No (Sat out due to 2-4 Transfer GPA Rule) | Yes (2) |
| 2022 | West Virginia (DI) | Full Season | Yes (2) | Yes (3) |
| 2023 | West Virginia (DI) | Partial Season | No (Redshirt) | Yes (4) |
| 2024 | Nevada-Reno (DI) | Full Season | Yes (3) | Yes (5) |

Now, in Fall 2025, Braham wants to compete in the upcoming 2025-2026 season but has no remaining eligibility under the current NCAA DI Bylaws concerning seasons of competition and years of eligibility. (ECF No. 8 at 2.) Braham has been informed that he is ineligible for the upcoming season under the NCAA's "Five-Year Rule" (Bylaw 12.8.1),[6] which limits athletes to four seasons of intercollegiate competition within a five-year

---

[6]Under the Five-Year Rule (Bylaw 12.8.1), "[a] student-athlete shall complete [their] seasons of participation within five calendar years from the beginning of the semester or quarter in which the student-athlete first registered for a minimum full-time program of studies in a collegiate institution, with time spent in the armed services, on official religious missions, or with recognized foreign aid services of the U.S. government being excepted." (ECF No. 8-6 at 11.)

eligibility window beginning from their full-time enrollment in a collegiate program, which includes any NCAA four-year member institution or two-year community college. (ECF No. 8-1 at 6-7; ECF No. 8-2 at 4; ECF No. 8-6 at 11; ECF No. 22 at 8.) This five-year window is known as the "Eligibility Clock" (ECF No. 8-2 at 4), and, under Bylaw 12.8.1.1, it starts to run from the date upon which the individual registers as a "full-time" student "in a regular term" at a "collegiate institution" and "attends the first day of classes for that term."[7] (ECF No. 8-1 at 6; ECF No. 8-6 at 11.) As specified, under Bylaw 12.8.1.2, the NCAA eligibility rules contain exceptions that allow for alternate forms of post-secondary education and athletic competition without affecting the five-year clock, including military service, religious missions, professional careers in other sports, or independent athletic or academic work. (ECF No. 8-6 at 11-12.)

Braham first attempted to seek relief through UNR's internal eligibility waiver process. (ECF No. 1 at 6.) Under NCAA Bylaw 5.4.1.3, only member institutions (i.e., four-year colleges and universities), conferences, or designated committees and subcommittees are authorized to file and seek legislative waivers; individual athletes are not permitted to do so on their own. (*Id.*; *see also* ECF No. 8-5 at 3.) On February 18, 2025, UNR's Senior Associate Athletics Director for Compliance, Joseph Flores, informed Braham that the university was unwilling to file or support an eligibility waiver on his behalf and advised him to seek legal counsel independently. (ECF No. 1 at 6-7; ECF No. 8-5 at 3.) On May 5, 2025, Braham's then attorney and agent, Joseph Benincasa, contacted Mr. Flores to confirm whether UNR maintained its position. (ECF No. 1 at 7.) Mr. Flores reaffirmed the university's refusal to pursue a waiver on Braham's behalf. (*Id.*; *see also* ECF No. 23 at 2.)

---

[7]Under Bylaw 14.02.4, a "collegiate institution" is defined as an institution of higher education that "[i]s accredited at the college level by an agency or association recognized by the secretary of the Department of Education and legally authorized to offer at least a one-year program of study creditable toward a degree"; or "[c]onducts an intercollegiate athletics program, even though the institution is not accredited at the college level and authorized to offer at least a one-year program of study creditable toward a degree." (ECF No. 8-1 at 6.) This definition includes Junior Colleges. (*Id.*)

With no available internal administrative recourse, Braham filed suit on May 27, 2025. The Complaint asserts claims for breach of contract; and for violations of Section 1 of the Sherman Antitrust Act of 1890 ("the Sherman Act"), which prohibits "contract[s], combination[s], or conspirac[ies] in restraint of trade or commerce." 15 U.S.C. § 1. (ECF 1 at 7).[8]

Braham seeks injunctive relief in time for him to be eligible to compete in the upcoming 2025-2026 season at UNR. (ECF No. 8-1 at 3; ECF No. 8-5 at 4.) In particular, he seeks a TRO and/or PI to enjoin the NCAA from enforcing its JUCO Eligibility Limitation Bylaws, including: (1) the Five-Year Rule, which counts his time at junior college as exhausting one year of intercollegiate competition and two years of eligibility and would bar Braham from being eligible to participate in the 2025-2026 NCAA DI football season; (2) the 2-4 Transfer GPA Rule as applied to Braham; and (3) the Rule of Restitution[9], to the extent it may be enforced against Braham or any NCAA member institution that allows him to compete. (ECF No. 8 at 3.) Braham alleges that he is suffering and will continue to suffer immediate and irreparable harm absent injunctive relief, citing the loss of an unreclaimable "once-in-a-lifetime opportunity" to compete in NCAA DI football—a loss that not only impacts his ability to secure "name, image, and likeness" ("NIL")[10] deals but that also impairs his prospects of playing professionally, deprives him of essential training and

---

[8]To the extent Defendant argues that Braham failed to show irreparable harm because of his "unreasonable delay" in seeking injunctive relief as Defendant appears to suggest in its motion to supplement (ECF Nos. 25, 25-1 at 3), the Court does not find the delay to be unreasonable under the present circumstances.

[9]The Rule of Restitution (Bylaw 12.11.4.2) allows for potential retroactive penalties if a student-athlete, initially deemed ineligible, is allowed to compete in accordance with a court-ordered restraining order or injunction that is later vacated, stayed, or reversed or ultimately determined by a court to have been unjustified. (ECF No. 8-1 at 18-19; *see also* ECF No. 8-6 at 14-15.)

[10]In 2021, the Supreme Court decision in *Alston* authorized the ability of collegiate student-athletes to earn compensation for their "name, image, and likeness" ("NIL"). *See National Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69 (2021) ("*Alston*"). While such opportunities are available to all athletes, "virtually all football-related NIL funds go to Division I football players." *Pavia*, 760 F.Supp.3d at 532.

1  competition experiences, and adversely affects his personal well-being and mental health.

2  (ECF No. 8-1 at 15-17; *see also* ECF No. 8-5 at 4.)

3  **III.    DISCUSSION**

4          To qualify for preliminary injunctive relief, a plaintiff must establish: (1) likelihood of

5  success on the merits; (2) likelihood of irreparable harm; (3) that the balance of equities

6  tips in his favor; and (4) that an injunction is in the public interest. *See Winter v. Natural*

7  *Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). While these factors are a balancing test, a

8  failure to establish a likelihood of success on the merits "'is usually fatal' to a plaintiff's

9  request for preliminary injunction." *See Pavia v. Nat'l Collegiate Athletic Ass'n*, 760

10 F.Supp.3d 527, 536 (M.D. Tenn. 2024) (quoting *Enchant Christmas Light Maze & Market*

11 *Ltd. v. Glowco, LLC*, 958 F.3d 532, 539 (6th Cir. 2020) (citation omitted)).

12         Because Braham seeks to alter the status quo by enjoining the NCAA from

13 enforcing the challenged bylaws, his request is subject to the heightened standard

14 applicable to mandatory injunctions. Relief that "orders a responsible party to 'take action'"

15 is treated as a mandatory injunction. *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH*

16 *& Co.*, 571 F.3d 873, 879 (9th Cir. 2009) (quoting *Meghrig v. KFC W., Inc.*, 516 U.S. 479,

17 484 (1996)). A mandatory injunction "goes well beyond simply maintaining the status quo

18 *pendent lite* and is particularly disfavored." *Id.* (quoting *Anderson v. United States*, 612

19 F.2d 1112, 1114 (9th Cir. 1980)). "In general, mandatory injunctions are not granted unless

20 extreme or very serious damage will result and are not issued in doubtful cases or where

21 the injury complained of is capable of compensation in damages." *Id.*; *see also Park Vill.*

22 *Apartment Tenants Ass'n v. Mortimer Howard Tr.*, 636 F.3d 1150, 1160 (9th Cir. 2011).

23         The Court will first address the parties' arguments under the *Winter* framework as

24 to Braham's likelihood of success on the merits and whether, absent injunctive relief,

25 Braham will suffer irreparable harm before turning to the balancing of the equities and the

26 public interest prongs, which will be addressed together. In sum, the Court finds that

27 Braham satisfies all four *Winter* factors and will grant preliminary injunctive relief.

28

### A.    Likelihood of Success on the Merits

Before addressing the merits of Braham's specific arguments under the Sherman Act, the Court must first address the NCAA's threshold argument that the Act does not apply because the challenged rules are "not commercial in nature" and, therefore, not subject to antitrust scrutiny. (ECF No. 22 at 17.) Other courts have held that Section 1 applies "only if the rule is commercial in nature." *Pavia*, 760 F.Supp.3d at 536 (citing *Worldwide Basketball & Sport Tours, Inc. v. Nat'l Collegiate Athletic Ass'n*, 388 F.3d 955, 958 (6th Cir. 2004)). The NCAA asserts that Section 1 applies only to "restraints of 'trade or commerce,'" 15 U.S.C. § 1, and contends that commercial activity is "activity from which the actor anticipates economic gain." (ECF No. 22 at 16) (citing *O'Bannon v. Nat'l Collegiate Athletic Ass'n*, 802 F.3d 1049, 1065 (9th Cir. 2015)). The NCAA claims that its eligibility rules are "noncommercial" (ECF No. 22 at 16) and cites *O'Bannon*, which looked clearly at the nexus between "commercial" and "eligibility." *See* 802 F.3d at 1066 (holding that rules regulating player compensation are "commercial" while rules that determine player eligibility are noncommercial).

Braham replies that the NCAA's attempt to cast its eligibility rules as "noncommercial" is misguided and outdated in a post-*Alston* world. (*See* ECF No. 23 at 3.) In *Alston*, the Supreme Court held that the NCAA violated federal antitrust law by restricting the compensation student-athletes could receive in exchange for their athletic services, thereby paving the way for collegiate athletes to earn compensation for their "name, image, and likeness". *See* 594 U.S. at 79, 93 (2021). In *Pavia*, 760 F.Supp.3d at 532, the district court points out that the *Alston* decision "drastically changed the landscape of collegiate athletics" by enabling the NCAA to permit student-athletes to earn NIL compensation. (*See* ECF No. 23 at 3.) Braham recites the effects of this "commercial expansion," including the NCAA's upcoming agreement—effective July 1, 2025—to permit member institutions to pay up to $20.8 million annually to their student-athletes, reflecting the lucrative benefits now available under a new commercialized model of collegiate

1  athletics. (ECF No. 23 at 3.) Thus, Braham contends that the challenged eligibility rules

2  are "commercial" and subject to antitrust scrutiny.

3      The Court agrees with Braham. The Court finds that, in a post-*Alston* world of NIL

4  compensation and changed "market realities," *O'Bannon*'s classification of NCAA eligibility

5  rules as "noncommercial," *see* 802 F.3d at 1066, is rendered moot. *See Elad v. Nat'l*

6  *Collegiate Athletic Ass'n*, 2025 WL 1202014, at *7 (D.N.J. Apr. 25, 2025) (finding that

7  "[w]hether an antitrust violation exists necessarily depends on a careful analysis of market

8  realities. If those market realities change, so may the legal analysis") (quoting *Alston*, 594

9  U.S. at 93 (citations omitted)); *see also Pavia*, 760 F.Supp.3d at 539 (emphasizing the

10  "new economic reality in the age of NIL compensation"). In the post-*Alston* collegiate

11  athletic world, the challenged eligibility rules are so intertwined with commercial rules and

12  benefits that they are, in essence, "commercial" in nature. Here, the Court agrees with

13  similar conclusions in *Elad*, 2025 WL 1202014, at *7, and *Pavia*, 760 F.Supp.3d at 537,

14  and finds that the Five-Year Rule as applied to JUCO players is commercial in nature

15  because it is tied to potential NIL agreements, which are "commercial transactions."

16  Accordingly, the Court concludes the challenged NCAA eligibility rules fall under the

17  purview of the Sherman Act.

18      The parties agree to the framework[11] (i.e., the "rule of reason"[12] analysis) that

19  applies to the Court's likelihood of success on the merits analysis. Braham argues that,

---

[11]Under *Alston*'s three-step burden-shifting framework for analyzing claims under Section 1 of the Sherman Act (15 U.S.C. § 1), Plaintiff must prove that (1) "the challenged restraint has a substantial anticompetitive effect." *Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69, 96 (2021) ("*Alston*"). Then, the burden shifts to Defendant to (2) "show a procompetitive rationale for the restraint." *Id.* If the Defendant succeeds in making the showing, then the burden shifts back to Plaintiff to (3) "demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means." *Id.* at 97.

[12]The "rule of reason" inquiry is used to determine whether a particular restraint is unreasonable by "weigh[ing] legitimate justifications for a restraint against any anticompetitive effects." *See, e.g., Aya Healthcare Services, Inc. v. AMN Healthcare, Inc.*, 9 F.4th 1102, 1108 (9th Cir. 2021) (quoting *Paladin Assocs., Inc. v. Mont. Power Co.*, 328 F.3d 1145, 1156 (9th Cir. 2003)). The purpose of the inquiry is to examine the "'circumstances, details, and logic of a restraint' to ensure that it unduly harms competition before a court declares it unlawful." *See Alston*, 594 U.S. at 97 (quoting *California Dental Ass'n v. F.T.C.*, 526 U.S. 756, 781 (1999)).

under *Alston*'s three-step framework for analyzing claims under Section 1 of the Sherman Act (15 U.S.C. § 1): (1) the JUCO Eligibility Bylaws have a substantial anticompetitive effect on the labor market for DI college football players; (2) the NCAA lacks pro-competitive justifications for the JUCO Eligibility Bylaws; and (3) any potential pro-competitive justifications for the JUCO Eligibility Bylaws could be achieved through less restrictive means. (ECF No. 8-1 at 10-15.) The Court will address each factor in turn but only as applicable to the Five-Year Rule.[13]

### 1.    The Five-Year Rule Has a Substantial Anticompetitive Effect on The Labor Market For DI College Football Players

To succeed under Section 1 of the Sherman Act, a plaintiff must first show that a defendant "(1) participated in an agreement that (2) unreasonably restrain[s] trade in the relevant market." *Pavia*, 760 F.Supp.3d at 536 (quoting *Nat'l Hockey League Players' Ass'n v. Plymouth Whalers Hockey Club*, 325 F.3d 712, 718 (6th Cir. 2003)). At issue is whether the Five-Year Rule unreasonably restrains trade in the relevant market, which Braham argues is the labor market for DI college football. (ECF No. 8-1 at 10-12.) Before reaching this issue, the Court first addresses the NCAA's argument that there is no evidence offered of a labor market for college football players. (ECF No. 22 at 19-20.)

In *Ohio v. NCAA*, the court examined the "exclusive market power" of the NCAA and its member institutions and held that "labor markets within NCAA Division I college athletics in the United States are relevant antitrust markets." *See* 706 F.Supp.3d 583, 592 (N.D.W.V. 2023). Other courts considering antitrust challenges to NCAA eligibility rules have made similar findings.[14] *See, e.g.*, *Alston*, 594 U.S. at 90 ("market for student athlete

---

[13]The challenged JUCO Eligibility Bylaws cover the 2-4 Transfer GPA Rule. Because the Court finds Braham has demonstrated likelihood of success as to the Five-Year Rule, the Court finds it unnecessary to address the Transfer GPA Rule.

[14]However, in *Fourqurean v. National Collegiate Athletic Association*, the Seventh Circuit cautioned that reliance on *Alston* to define the relevant market "overstates the scope of the Court's ruling," as the Supreme Court there "did not decide the question of market definition." *See* 2025 WL 1944005, at *7 (7th Cir. July 16, 2025) (reversing grant of preliminary injunction where plaintiff failed to show a likelihood of success on his Sherman Act claim challenging the NCAA's Five-Year Rule).

services"); *see also Elad*, 2025 WL 1202014, at *2 (giving "substantial weight" to definition of the relevant market as "the labor market for college football athletes in general and NCAA Division I football specifically"). Here, the Court agrees with Braham that the relevant market is NCAA DI college football, as it is the sole pathway to NFL opportunities, and participation provides unique benefits, including NIL compensation, which are not available elsewhere, including at the JUCO level. (*See* ECF No. 8-1 at 11.)

The Court next addresses whether Braham has presented sufficient evidence that the challenged Five-Year Rule unreasonably restrains trade within the labor market for NCAA DI college football. Braham has met this threshold. Braham maintains the challenged restraint restricts competition in the DI college football market by "limit[ing] the amount of time [JUCO] athletes may play DI football because they have chosen to attend a non-NCAA institution before transferring to a DI NCAA college." (ECF No. 8-1 at 13.) Braham argues that this restraint, in turn, directly harms consumers (i.e., football players) in the relevant market by preventing access to NIL benefits. (*See id.* at 11-13.) The NCAA counters that the challenged rule does "not injure competition…by excluding a whole set of players who, like Braham, are no longer eligible," suggesting that, here, no harm exists because the eligibility rules simply define who can and cannot compete. (ECF No. 22 at 23.) The Court finds this line of reasoning to be circular and agrees with Braham.

Braham is correct in that the Five-Year Rule harms competition in the relevant market by excluding a qualified cohort—namely, JUCO athletes. In *Pavia*, the district conducted a similar analysis under the rule of reason and found that the NCAA eligibility rules "giv[e] a competitive advantage to NCAA Division I member schools over junior colleges – and thus the football players at each level" and that the "disparate treatment of these two groups also results in a distortion of the labor market for NCAA Division I football players." 760 F.Supp.3d at 539-40 (holding that plaintiff demonstrated a "likelihood that the challenged restraints have a substantial anticompetitive effect").

The Court further finds the Five-Year Rule results in commercial harm by foreclosing the opportunity for JUCO players to pursue NIL compensation at the DI level.

Such "disparate treatment" described above has material consequences for JUCO players who are excluded from the various benefits "disproportionately" conferred at the NCAA DI level, including "more exposure, potentially better competition and coaching, and financial advantages due to the NIL opportunities." *See Pavia*, 760 F.Supp.3d at 540. Indeed, the NCAA likewise concedes that the "only injury is that, by virtue of their loss of eligibility, the [JUCO] players have lost an opportunity to play…and thus earn NIL money." (ECF No. 22 at 24.)

In assessing the challenged restraint for commercial harm, the Court follows the Supreme Court's guidance in *Alston* to consider the "'circumstances, details, and logic of a restraint'" before declaring it "unlawful." *See* 594 U.S. at 97. As such, the Court finds persuasive *Pavia*'s acknowledgment of the "new economic reality in the age of NIL compensation." *See* 760 F.Supp.3d at 540. Thus, the Court concludes that the Five-Year Rule's undue restraint on competition harms commerce, where "commerce," under the present circumstances, encompasses the opportunity for JUCOS athletes to compete for NIL compensation.

Accordingly, the Court finds the Five-Year Rule to be an unlawful restraint that produces a substantial anticompetitive effect in the labor market for DI college football by excluding JUCO players from competition and, therein, from access to commercial NIL benefits.

**2.    The NCAA Lacks Pro-Competitive Justifications for The Five-Year Rule**

Having found that Braham can demonstrate that the Five-Year Rule has a substantial anticompetitive effect, the burden shifts to the NCAA to provide a sound procompetitive justification for the Five-Year Rule. The NCAA offers that the procompetitive benefits of the challenged eligibility rules include: "(1) preserving college athletics as a unique product that is differentiated from professional sports; (2) expanding opportunities for prospective and current student-athletes; and (3) better aligning athletics and academics." (ECF No. 22 at 26.) The Court does not find these justifications compelling. *See Pavia,* 760 F.Supp.3d at 541-42 (rejecting the NCAA's argument that the

eligibility rules confer procompetitive benefits, including: "(1) preserv[ation] [of] intercollegiate athletics as a unique offering; (2) increasing the number of students who compete in Division I football; (3) improve[ment] [of] the quality of the student-athlete experience; and (4) foster[ing] better alignment between athletics and academics").

As to the first justification, if the "unique" and "differentiated" product for the NCAA is an established and fixed version of what it means to be a "student-athlete" (*see* ECF No. 22 at 26), this runs counter to the NCAA's other exceptions to its Five-Year Rule that allow for older students to join after prep school, military service, and/or religious obligations. *See Elad*, 2025 WL 1202014, at *9 (holding that the NCAA's claim to a differentiated product of "younger, less experienced" athletes is inconsistent with its exceptions to the Five-Year Rule for older students) (*see e.g.*, NCAA Bylaw 12.8.1.2).

The NCAA argues, in response, that the challenged rules "enhance access to college football and improve the student-athlete experience by ensuring more prospective student-athletes can enjoy the collegiate experience." (ECF No. 22 at 26.) However, as the *Pavia* court observed, given the NCAA's exceptional "treatment of other student-athletes with comparable or more post-secondary experience" under Bylaw 12.8.1.2, its claim that eligibility rules are needed to "prevent age and experience disparities and preserve the quality of experience" is unconvincing. *See Pavia*, 760 F.Supp.3d at 542. The Court therefore finds the NCAA has not satisfied its burden of advancing a procompetitive rationale for its eligibility restraints.

**3.    Any Potential Pro-Competitive Justifications for The Five-Year Rule Could Be Achieved Through Less Restrictive Means**

Lastly, as suggested in *Pavia*, *see* 760 F.Supp.3d at 543, Braham proposes the less restrictive alternative of changing the start of the eligibility clock under the Five-Year Rule to be triggered based on when an athlete first registers for classes at an NCAA member institution instead of when they register at a "collegiate institution." (ECF No. 8-1 at 14.) Similarly, Braham proposes changing the definition of "intercollegiate competition" (*see* NCAA Bylaw 12.02.6) to reference when an athlete is "in a[n] NCAA member

institution" as opposed to "in either a two-year or four-year collegiate institution." (*Id.* at 14-15; ECF No. 8-6 at 10.) *See id.* In response, the NCAA counters that excepting non-NCAA schools from the Five-Year Rule would enable student-athletes to "compete indefinitely" at the junior college level before commencing their NCAA career. (ECF No. 22 at 28-29.) The NCAA also argues that counting JUCO seasons of competition under the Rule ensures natural degree progression within the NCAA four-year member institution. (ECF No. 22 at 28.)

Braham's proposed alternatives—i.e., to not count JUCO-level seasons of competition toward the eligibility clock at the DI level, to provide JUCO transfer students with an extra year of eligibility, or to change the definition of "intercollegiate competition"— eliminate the anticompetitive harm. The existence of the exceptions under the Five-Year Rule that allow for alternate forms of post-secondary education and athletic competition without affecting the eligibility clock (*see* ECF No. 8-6 at 11-12) highlights the unfairness of treating JUCO competition as analogous to DI competition. Moreover, as the Court has iterated above, in a post-*Alston* world of NIL compensation at the DI level, the structural exclusion of JUCO players is plainly unfair in that it restricts the number of years athletes have to compete for such opportunities.

**B.    Irreparable Harm**

Proceeding to the second *Winter* factor, a plaintiff must prove a likelihood of irreparable harm in the absence of preliminary relief. *See Winter*, 555 U.S. at 20. Irreparable harm is proven by demonstrating "immediate threatened injury." *See, e.g.*, *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 675 (9th Cir. 1988) (citation omitted) (denying preliminary injunctive relief where "liability [was] too remote and speculative to constitute an irreparable harm").

Here, Braham argues that he would be irreparably harmed without a preliminary injunction to alter the status quo for the following reasons: (1) Braham will miss out on the unreclaimable "once-in-a-lifetime opportunity" to play NCAA DI football in the 2025-2026 season (ECF No. 8-1 at 15) and will also be excluded from additional training

opportunities, including pre-season summer camp, hindering his ability to fully "integrate" with the team and program (*Id.* at 16); (2) Braham will be denied the opportunity to receive attention from professional recruiters, thereby limiting his chances of signing "NIL" contracts valued at $500,000 and pursuing a professional career in the NFL (*Id.*at 16-17; ECF No. 8-5 at 3; ECF No. 12 at 2); and (3) taken together, these deprivations will "impact his personal experience and mental health." (ECF No. 8-1 at 17.) The Court generally agrees with Braham.

The Court finds that the denial of the opportunity to play sports is irreparable harm. *See Pavia*, 760 F.Supp.3d at 543-44; *see also Ohio*, 706 F.Supp.3d at 597 ("Courts have repeatedly found that '[c]ollege students suffer irreparable harm when they are denied the opportunity to play sports.'") The Court is unpersuaded by the NCAA's argument that "losing the opportunity to play…due to ineligibility is not irreparable harm." (ECF No. 22 at 29.) At the Hearing, the NCAA expanded on this contention by arguing that Braham has not suffered an antitrust injury because he is not "eligible" to play. However, the Court finds the NCAA's line of reasoning to be circular. Braham's status is a product of the current eligibility rules, which are intertwined with commercial opportunity, including the NIL deals described below. Braham's loss of the opportunity to play NCAA DI football in the upcoming 2025-2026 season constitutes irreparable harm, as the loss stems from restrictive bylaws, here, the Five-Year Rule, that unfairly bar former JUCO players from participating, thereby suppressing competition.

Moreover, without immediate relief, Braham will lose the opportunity to participate in pre-season summer training camp, which, as he asserts, would "deprive him of critical and irreplaceable opportunities to become integrated into the program and the team as a whole." (ECF No. 8-1 at 16.) Loss of pre-season opportunities will likely have an "incalculable" impact on Braham's "personal experience" during the regular season. *See Elad v. NCAA*, 2025 WL 1202014, at *9 (D.N.J. Apr. 25, 2025); *compare Ohio*, 706 F.Supp.3d at 599 (holding that "missing regular season games constitutes a significant impact on the student-athletes' opportunities to develop as players in gametime

conditions, develop in-game experience with their teammates, showcase their abilities to potential employers, and help their teams advance to their respective Conference Tournament and NCAA Tournament").

The Court further agrees with Braham that, if precluded from playing NCAA DI football in the upcoming 2025-2026 season, he will lose the invaluable opportunity for exposure to professional recruiters, thereby diminishing his prospects of securing "NIL" contracts valued at $500,000—contracts that, as asserted in Braham's declaration, are "conditioned upon [his] participation in the upcoming season" (ECF No. 8-5 at 3). *See Pavia*, 760 F.Supp.3d at 544 (finding that a student-athlete's lost opportunity to play NCAA DI football results in the loss of opportunity for "exposure" and "building his 'personal brand'"). Moreover, contrary to NCAA's argument (ECF No. 22 at 29), the value of missed NIL opportunities here does not equate to quantifiable financial loss. Regardless of whether such offers may result in calculable monetary compensation, the foregone opportunity to "market" one's "name" and "likeness" and to "showcase abilities to future employers" cannot be estimated or quantified. *See Williams*, 2024 WL 397760, at *3. Accordingly, the Court finds that, although the "value of missed NIL opportunities could potentially be quantified," *see Pavia*, 760 F.Supp.3d at 544, Braham's loss of the opportunity to play his final season and to be considered for offers tied to professional recruitment constitutes a unique harm that cannot be estimated or adequately compensated by money, alone. Stated differently, the loss of a foregone "experience" is distinguished from mere financial harm. The Court also agrees with Braham that this harm is particularly imminent given his one year of remaining athletic eligibility at the NCAA DI level, after which he will no longer have opportunities to compete at the collegiate level or be considered for NIL deals tied to NCAA participation. (*See* ECF No. 12 at 2.)

Braham argues that the harm of losing the opportunity to play NCAA DI football in the 2025-2026 season combined with the loss of pending NIL opportunities, taken together, "impact his personal experience and mental health." (ECF No. 8-1 at 17.) *See Ohio*, 706 F.Supp.3d at 599-600 (holding that "[s]tudent-athletes ineligible for competition

under the Transfer Eligibility Rule face immediate and irreparable harm for every athletic contest they are forced to sit out, whether it be economic harm or well-being harm").While the NCAA disputes the potential economic harms faced, as described above, it fails to address the myriad ways in which this lost opportunity is likely to impact Braham's overall well-being. Based on the reasons discussed above, the Court finds Braham has shown that imminent and substantial irreparable harm will result unless the Court preliminarily enjoins the NCAA's enforcement of the Five-Year Rule.

### C.    Balance of the Equities & the Public Interest

The Court considers the third and fourth factors together. Because the Court concludes Braham is likely to both succeed on the merits and suffer irreparable harm, it necessarily finds that the balance of the equities and the public interest also weigh in favor of granting the injunction. "To determine which way the balance of the hardships tips, a court must identify the possible harm caused by the preliminary injunction against the possibility of the harm caused by not issuing it." *Univ. of Haw. Prof'l Assembly v. Cayetano*, 183 F.3d 1096, 1108 (9th Cir. 1999). The Court must then weigh "the hardships of each party against one another." *Id.* As to public interest, "[i]n exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24.

With respect to the third factor, the NCAA argues that "granting the relief request[ed] would adversely impact the decisions and collegiate careers of tens of thousands of student-athletes," whereby granting Braham an additional year of eligibility would displace other players by allowing him to "gain at the expense of another who would otherwise fill his scholarship and roster spot." (ECF No. 22 at 30-31.) However, the NCAA failed to present any evidence of a fixed roster demonstrating proof of actual displacement. The NCAA also conceded at the Hearing that there is now no longer a cap on roster limits. (ECF No. 26.)

NCAA's argument that preliminary injunctive relief in this case will cause displacement and will "suspend longstanding eligibility rules that apply to over 500,000

NCAA student-athletes in multiple sports" (ECF No. 22 at 30) is misguided and fails to address the essence of the harm at issue—that the differential treatment of JUCO student-athletes under the Five-Year Rule limits students' ability to participate and, thus, reduces competition at the DI level. Enjoining the NCAA from enforcing the Five-Year Rule as to Braham for next season will not result in substantial harm to others or to the NCAA. *See Pavia*, 760 F.Supp.3d at 544 (holding that enjoined enforcement of the Intercollegiate Competition Rule as to the plaintiff would not cause "substantial harm" to others or to the NCAA). However, absent a grant of injunctive relief, Braham is likely to suffer substantial, immediate, and irreparable harm because he will be prevented from playing in the upcoming 2025-2026 season. Accordingly, the Court finds that the balance of the equities tips in favor of Braham.

Issuance of a preliminary injunction in this case would also serve the public interest. The Court agrees with Braham that there is a "compelling public interest in promoting fair competition and equal opportunities for all collegiate athletes." (ECF No. 8-1 at 18.) Here, the public interest is served by promoting free and fair competition in the DI market for college football. *See Pavia*, 760 F.Supp.3d at 544 (holding that the "public interest is served by promoting free and fair competition in labor markets"); *see also Ohio v. NCAA*, 706 F.Supp.3d 583, 600 (N.D.W.V. 2023) (holding that TRO enjoining college athletics association from enforcing its bylaw prohibiting a student-athlete from playing following their second transfer would "serve the public interest in promoting free and fair competition in labor markets guaranteed by antitrust laws"); *see also Williams v. Natl. Collegiate Athletic Ass'n*, 2024 WL 397760, at *3 (D.N.J. Feb. 2, 2024) (holding that "[f]ree and fair competition in the labor markets is essential to the American economy"). In sum, the Court finds the balancing of the equities and public interest factors weigh in favor of granting Braham's Motion.

///

///

///

### D.    The Restitution Rule

Finally, Braham asks the Court to enjoin the NCAA's Rule of Restitution (Bylaw 12.11.4.2), arguing that it unlawfully penalizes student-athletes and their schools for relying on court-issued injunctions that temporarily block NCAA rules. (ECF No. 8-1 at 18-20.) Braham argues that enjoining the rule is necessary for the requested relief to have meaningful effect. (*Id.*) The NCAA does not oppose this request. The Court finds that the Restitution Rule must be enjoined for the preliminary injunctive relief to have meaningful effect. Accordingly, the Court will enjoin NCAA's enforcement of the Rule against Braham.

## IV.    CONCLUSION

The Court notes that the parties made several arguments and cited several cases not discussed above. The Court has reviewed these arguments and cases and determines that they do not warrant discussion as they do not affect the outcome of the Motion.

It is therefore ordered that Braham's Motion (ECF No. 8) for a preliminary injunction is granted. Pending a final decision on the merits, the NCAA is enjoined from enforcing the (1) Five-Year Rule as it applies to Braham's time at junior college in connection with Braham's eligibility in the upcoming 2025-2026 football season and the (2) Rule of Restitution against Braham.

It is further ordered that the NCAA's second motion for notice of supplemental authority (ECF No. 27) is granted.

DATED THIS 18th Day of July 2025.


_____
MIRANDA M. DU
UNITED STATES DISTRICT JUDGE